UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 24-cr-0022 (KMM/JFD) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Ricardo Rydell Walker, | |
| Defendant. | |

This case is before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1 for a report and recommendation on Defendant Ricardo Rydell Walker's Motion to Dismiss Indictment (Dkt. No. 21) and Motion to Suppress Statements, Admissions, and Answers (Dkt. No. 22). Mr. Walker is charged with Receipt of a Firearm While Under Indictment for a Felony, in violation of 18 U.S.C. §§ 922(n)(1) and 924(a)(1)(D); and Possession of a Firearm by a Person Adjudicated as Mentally Defective or Committed to a Mental Institution, in violation of 18 U.S.C. §§ 922(g)(4) and 924(a)(8). (Indictment, Dkt. No. 14.)

The Court held a motions hearing on April 17, 2024. Assistant United States Attorney William Mattessich represented the United States. Assistant Federal Defender Matthew Deates represented Mr. Walker. The United States called FBI Special Agent

Michael Lemmage to testify. (*See* Mot. Hr'g Tr. ("Tr") 13, Dkt. No. 40.)[1] The United States introduced two exhibits at the hearing: (1) body-worn camera footage from Maplewood Police Officer Jay Wenzel on July 6, 2022 (Gov't Ex. 1); and (2) an audio recording of an interview of Mr. Walker on July 7, 2022 (Gov't Ex. 2). (*See* Ex. List, Dkt. No. 31.) Mr. Walker introduced Officer Wenzel's report dated July 6, 2022 (Def. Ex. 1). (*Id.*) After the hearing, Mr. Walker and the United States filed supplemental briefs (Dkt. Nos. 38, 42), and at the Court's direction, Mr. Walker filed a state order for civil commitment under seal (Def. Ex. 2, Dkt. No. 39). The Court took the motions under advisement on June 7, 2024, the date of the last brief. For the reasons set forth below, the Court recommends that the motion to suppress statements be granted and the motion to dismiss the indictment be denied.

**I.    BACKGROUND**

On July 6, 2022, Mr. Walker and two other individuals were sleeping in a blue Chevrolet Captiva parked at the Maplewood Mall. (Tr. 15.) Officers on the scene attempted to open the car door, and Mr. Walker drove the car out of the parking lot. (Tr. 15.) Officers pursued and stopped the car. (Tr. 16.) The three occupants got out of the car and were apprehended. (Tr. 16.) Officer Wenzel, who was wearing a body camera, apprehended Mr. Walker. (Tr. 16–17.) Other officers searched the car and immediate area, and one officer located a black handgun on the ground near the car, just outside the driver's door. (Tr. 17.)

---

[1] The motion hearing transcript is currently restricted from public access, but this Report and Recommendation does not contain any confidential information, personal identifiers, or redacted information.

Mr. Walker was arrested and placed in Officer Wenzel's squad car at about 10:00 a.m.. (Tr. 21, 34.)

Officer Wenzel advised Mr. Walker of his *Miranda* rights while he was detained in the back of the squad car. (Tr. 22; Gov't Ex. 1 at 32:20–36.) Officer Wenzel asked Mr. Walker if he understood each of his rights, and Mr. Walker answered, "Yep." (Gov't Ex. 1 at 32:36–43.) Officer Wenzel then asked, "Having these rights in mind do you wish to talk to me at this time without a lawyer present?" (Gov't Ex. 1 at 32:43–45.) Mr. Walker replied, "Nope, nope, nope." (Tr. 22; Gov't Ex. 1 at 32:36–48.) Officer Wenzel then said, "*Miranda* warnings have been read, and he has declined to talk to me without a lawyer present." (Tr. 22; Gov't Ex. 1 at 32:48–59.) Officer Wenzel transported Mr. Walker to the Ramsey County Adult Detention Center. (Tr. 19.) Officer Wenzel's post-incident narrative dated July 6, 2022 reflects, "I read WALKER his Miranda Warnings and when asked if he would answer questions without a lawyer he stated 'no.'" (Def. Ex. 1.)

The following day, July 7, 2022, at 9:22 a.m., St. Paul Police Sergeant Matt Onnen and Special Agent Lemmage went to the Ramsey County Adult Detention Center to interview Mr. Walker. (Tr. 23.) Sergeant Onnen gave a *Miranda* warning, which Mr. Walker verbally acknowledged. Mr. Walker also apparently signed a waiver of rights form.[2] (Tr. 26; Gov't Ex. 2 at 2:50–3:42.)

The officers began the interview with questions about what Mr. Walker had been doing the previous day and the car he had been driving. Mr. Walker answered the questions.

---

[2] No waiver of rights form was introduced into evidence at the hearing. However, it is discussed on the recording.

The officers then asked several questions about a series of armed robberies and the gun recovered near the car. Mr. Walker continued to speak to the officers. When Sergeant Onnen asked Mr. Walker where he got the gun, about 15 minutes into the interview, Mr. Walker said, "Why would I . . . man, stop talking to me. You might as well just send me back to my room." (Gov't Ex. 2 at 17:46–56.) Sergeant Onnen asked, "Why?" (Gov't Ex. 2 at 17:56–57.) Mr. Walker responded, "You might as well send me back to the holding cell until I go to court. I'm not finna keep talking to you." (Gov't Ex. 2 at 17:57–18:03.) Sergeant Onnen again asked, "Why?" (Gov't Ex. 2 at 18:03–04.) Mr. Walker said, "Ain't no 'why' . . . . I'm not finna tell on myself . . . . I don't know why you keep asking me questions, like I'm gonna tell you where'd I get it from." (Gov't Ex. 2 at 18:04–20.) Sergeant Onnen said, "Let me ask you this: How long have you had it?" (Gov't Ex. 2 at 18:20–22.) Mr. Walker responded, "not long," and then made statements about how he had obtained the gun. (Tr. 30–31, 38–39; Gov't Ex. 2 at 18:22–20:18.) The interview continued for a further 16 minutes before an attorney from the public defender's office arrived. (Gov't Ex. 2 at 37:13–21.) The attorney told Mr. Walker that he did not have to talk to the officers, and the interview ended. (Gov't Ex. 2 at 37:22–42.)

## II.   MOTION TO SUPPRESS STATEMENTS

Mr. Walker moves to suppress the statements he made to law enforcement officers on July 7, 2022. He alleges two grounds for suppression. First, he argues that he clearly and unambiguously invoked his Fifth Amendment right to counsel on July 6 and, therefore, the July 7 questioning violated that invocation of rights. Second, he argues that he invoked his Fifth Amendment right to remain silent on July 7 when he told Special Agent Lemmage

4

and Detective Onnen, "I'm not finna keep talking to you," but they did not cease questioning. There is no dispute that Mr. Walker was in custody on both occasions.

### A. Mr. Walker Clearly and Unambiguously Invoked His Right to Counsel on July 6.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the United States Supreme Court held that "statements obtained from an individual who is subjected to custodial police interrogation" are not admissible at trial unless law enforcement has followed "procedures which assure that the individual is accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." 384 U.S. 436, 439, 467 (1966). In particular, a person who is in custody and being questioned "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

Concerning the right to the presence of an attorney, a suspect must "unequivocally and unconditionally invoke his right to counsel." *United States v. Mohr*, 772 F.3d 1143, 1145 (8th Cir. 2014). An officer must stop questioning only "if a suspect's request for an attorney is clear and unambiguous." *Id.* (citing *Davis v. United States*, 512 U.S. 452, 461–62 (1994)).

The Court finds that Mr. Walker clearly and unambiguously invoked his right to counsel on July 6. Officer Wenzel explicitly asked Mr. Walker if he wanted to speak

without a lawyer present, and Mr. Walker said, "Nope, nope, nope." Officer Wenzel confirmed out loud that Mr. Walker had declined to talk to him without a lawyer present. Neither Officer Wenzel nor Mr. Walker said anything more at the scene, although Officer Wenzel wrote in his post-incident narrative that Mr. Walker had declined to speak without a lawyer.

The United States argues that Mr. Walker did not invoke his right to counsel because Mr. Walker did not say the words "lawyer" or "attorney" and because he did not request a lawyer, but just said "nope, nope, nope." That argument splits a hair too finely. "Context matters when determining whether a suspect unambiguously invoked his *Miranda* rights; an invocation that is ambiguous by itself may be unambiguous when considered in conjunction with the statements or events preceding it." *United States v. Cordier*, 224 F. Supp. 3d 835, 840 (D.S.D. 2016). For example, in *Smith v. Illinois*, 469 U.S. 91 (1984), the suspect answered, "Uh, yeah. I'd like to do that," when advised, "You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?" *Id.* at 93. The Supreme Court found "no ambiguity" in this request for counsel, *id.* at 92, even though the suspect's statement, standing alone, had little meaning, *see Cordier*, 224 F. Supp. 3d at 840. In *Cordier*, the suspect said, "But I don't wanna waive my rights though," which the court found was an unambiguous invocation of *Miranda* rights. 224 F. Supp. 3d at 841; *see also United States v. Payne*, No. 4:15-CR-245 HEA (SPM), 2015 WL 6445460, at *2, 8 (E.D. Mo. Aug. 24, 2015), *R. & R. adopted*, 2015 WL 6445352 (E.D. Mo. Oct. 23, 2015) (finding an unambiguous invocation of rights when a suspect refused to sign a waiver of rights form and said, "I mean I don't want to sign

6

[ . . .] that's a consent. I'm not giving any kind of consent to anything."); *United States v. Horton*, No. 4:08-CR-3005, 2009 WL 1872612, at *5 (D. Neb. June 30, 2009) (finding an unambiguous invocation of rights when a suspect said, "No, I'm not," when asked if he was willing to waive his *Miranda* rights).

In the case at hand, Mr. Walker answered the question that he was asked by Officer Wenzel: "[D]o you wish to talk to me at this time without a lawyer present?" Mr. Walker's answer was shaped by the question he was asked. The United States apparently would have the law require that no matter what Mr. Walker was asked, a response that does not include the words "attorney," "lawyer," or some other synonym would be deemed not clear and unambiguous and therefore Mr. Walker should be found by the Court not to have invoked his right to counsel. But this mistakenly elevates one way of being clear and unambiguous into a general rule. The question for a court is always whether the subject invoked his right to counsel clearly and unambiguously, not whether the subject was clear and unambiguous in one specific way. The limitations of the linguistically rigid, context-ignoring method of analysis urged by the United States can be seen in this case when Officer Wenzel states, apparently for the benefit of the recording, that Mr. Walker would not speak to law enforcement without the presence of a lawyer. Officer Wenzel and Mr. Walker understood each other perfectly—Mr. Walker was invoking his right not to be questioned without counsel. The United States's claim that perhaps Mr. Walker was saying he would speak, but just not right then, or perhaps he was saying he would not speak at all, departs from what is seen on the video too radically to be credible. On the recording, one observes a clearly stated question by Officer Wenzel, a clearly stated answer from Mr. Walker, and a

7

clear repetition of Mr. Walker's answer by Officer Wenzel. Under the circumstances, no reasonable officer would have understood that Mr. Walker only *might* have been invoking his right to have an attorney present during questioning. And Officer Wenzel, whom the Court has no reason to doubt is a reasonable officer, understood perfectly that Mr. Walker would not speak without an attorney present.

The invocations of counsel at issue in the United States' case authority are distinguishable. In *United States v. Havlik*, 710 F.3d 818, 821 (8th Cir. 2013), the suspect said, "I don't have a lawyer. I guess I need to get one, don't I?" The question was "insufficient to trigger an obligation to cease questioning." *Id.*; *accord Dormire v. Wilkinson*, 249 F.3d 801, 804 (8th Cir. 2001) (on habeas review, determining that a state court had not been unreasonable in finding the question "Could I call my lawyer?" not an unambiguous invocation of the right to counsel). Mr. Walker did not ask a question here. He made a statement.

The suspect in *Havlik* made a second alleged invocation: "I guess you better get me a lawyer then." *Id.* at 822. That purported invocation was ambiguous because the word "guess" connotes equivocation. *Id.* Nothing about "Nope, nope, nope" is the least bit equivocal. It is, in fact, emphatic.

**B.     The July 7 Interview Violated Mr. Walker's Invocation of the Right to Counsel.**

"The right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations . . . that it requires the special protection of the knowing and intelligent waiver standard." *Davis v. United States*, 512 U.S. 452, 458 (1994) (cleaned up)

(quoting *Edwards v. Arizona*, 451 U.S. 477, 483 (1981)). Once a suspect invokes his right to counsel, "he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.*

The United States argues that "[i]f Walker invoked his right to silence" on July 6, that request was scrupulously honored, and the "significant period of time" that passed before the July 7 interview allowed law enforcement to approach Mr. Walker for an interview on that date. (Gov't Post-Hr'g Br. at 8, Dkt. No. 42.) This argument misses the point because in response to Officer Wenzel's question, Mr. Walker clearly and unambiguously invoked his right to *counsel*. A lawyer was not made available to him before the July 7 interview, nor did Mr. Walker himself reinitiate the conversation. Accordingly, all of Mr. Walker's July 7 statements should be suppressed.[3]

### III.   MOTION TO DISMISS THE INDICTMENT

Mr. Walker moves to dismiss both counts in the Indictment. Count One charges Mr. Walker with receiving a firearm while under felony indictment, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D). Count Two charges Mr. Walker with possessing a firearm as a person adjudicated mentally defective or committed to a mental institution, in violation of 18 U.S.C. §§ 922(g)(4) and 924(a)(8). Mr. Walker argues that the charges violate the Second Amendment of the U.S. Constitution both facially and as applied, in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

---

[3] Because the Court has concluded that the July 7 statements should be suppressed as obtained in violation of Mr. Walker's Fifth Amendment right to counsel, the Court does not address whether the statements were obtained in violation of his Fifth Amendment right to remain silent.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the Supreme Court considered whether the State of New York's handgun licensing regime violated the Constitution. 597 U.S. at 10. In finding that it did, the Court rejected a two-step framework that combined history and means-end scrutiny, which had been adopted by the circuit courts of appeals. *Id.* at 17. Instead, "[i]n keeping with" *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. To justify regulating the conduct, "the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. The question for the courts is whether the regulation is "consistent with the Second Amendment's text and historical understanding." *Id.* at 20.

A.     **Section 922(n)**

In relevant part, § 922(n) provides: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm . . . which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(n). The conduct Mr. Walker has been charged with—receipt of a firearm while under indictment for a felony—is covered by the Second Amendment's

10

plain text. *See, e.g., United States v. Ogilvie*, No. 2:23-CR-00063-TC, 2024 WL 2804504, at *2 (D. Utah May 31, 2024). The Constitution therefore presumptively protects the conduct. *See Bruen*, 597 U.S. at 17; *Ogilvie*, 2024 WL 2804504, at *2. The United States agrees. (Gov't Omnibus Resp. at 4, Dkt. No. 26.)

The Court now turns to the United States' showing that § 922(n) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *See Bruen*, 597 U.S. at 19. Determining whether a regulation is "consistent with the Second Amendment's text and historical understanding" is not always a straightforward inquiry. *See id.* at 26. The historical inquiry "will often involve reasoning by analogy" and "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28–29. Central to this determination are "how and why" the regulation burdens the Second Amendment right. *Id.* at 29 (explaining "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry") (cleaned up).

Analogical reasoning "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. "On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* (cleaned up). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphases in *Bruen*). "So even if a modern-

11

day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

### 1. Section 922(n) Is Consistent with the Historical Tradition of Pretrial Detention and Conditions.

The United States first argues that § 922(n) is consistent with the historical tradition of pretrial detention and conditions. (Gov't Omnibus Resp. at 5.) The United States points to the Bail Reform Act, which contains procedures for pretrial detention that necessarily burden an individual's Second Amendment rights, such as the physical restraint inherent in detention and the prohibition on possessing a firearm. (*Id.* at 5 (citing 18 U.S.C. § 3142(c)(1)(B)(viii)).) Mr. Walker urges the Court not to rely on the Bail Reform Act as a historical analogue because it was enacted in 1984, nearly two centuries after the Second Amendment was ratified in 1791. (Def. Post-Hr'g Mem. at 18.) But "the lack of historical regulations restricting the Second Amendment rights of people under indictment" when the Second Amendment was ratified "is not dispositive because the public safety threat posed by pretrial indictees was substantially different during the founding era." *Ogilvie*, 2024 WL 2804504, at *5. Indeed, "bail was not available for many crimes that were then treated as capital offenses but which today would be treated as felonies within § 922(n)'s scope." *United States v. Rowson*, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023), *quoted in Ogilvie*, 2024 WL 2804504, at *5. "In any event, the government has always been able to impose 'substantial liberty restrictions' on indicted defendants (including detention or, alternatively, conditions of pretrial release) when needed to promote 'the operation of our

criminal justice system.'" *Ogilvie*, 2024 WL 2804504, at *2 (quoting *United States v. Salerno*, 481 U.S. 739, 749 (1987)).

In *United States v. Slye*, the court specifically considered whether the Bail Reform Act's condition prohibiting possession of a firearm was consistent with the Nation's historical tradition of regulating firearms, and the court concluded it was. No. 1:22-MJ-144, 2022 WL 9728732, at *2 (W.D. Pa. Oct. 6, 2022). The court reasoned that "the Constitution has never guaranteed a criminal defendant's right to pretrial release" and cited precedent dating to the late 1700s. *Id.* "[H]istory recognized detention as a restriction that could be imposed upon a person who was accused, but not convicted of a crime," and inherent in that detention was "the temporary abridgement of numerous core constitutional rights including . . . the right to bear arms." *Id.* ("The Court is aware of no precedent for a person retaining his gun while jailed and awaiting trial."). Thus, while there is a long historical tradition of pretrial release, that release has been accompanied by reasonable conditions, including firearms restrictions.

> **2.   Section 922(n) Is Consistent with the Historical Tradition of Restricting Firearms from People Who Present an Unacceptable Risk of Dangerousness.**

The United States next argues that § 922(n) is consistent with the historical tradition of restricting firearms from people "who deviated from legal norms or persons who presented an unacceptable risk of dangerousness." (Gov't Omnibus Resp. at 6 (citing *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011)).) The historical analogue identified by the United States is surety statutes. These statutes "required any person who was reasonably likely to 'breach

the peace' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Bruen*, 597 U.S. at 56. Section 922(n) is analogous to surety laws because both "provide[] a limited restriction on the right to self-defense, and that restriction is the result of a finding that individuals under indictment pose a potential threat." *Ogilvie*, 2024 WL 2804504, at *5; *see also United States v. Kays*, 624 F. Supp. 3d 1262, 1267–68 (W.D. Okla. 2022).

### 3. Mr. Walker's "As Applied" Challenge

Mr. Walker indicated in his moving papers that he was bringing both a facial challenge and an "as applied" challenge to § 922(n). He did not, however, argue that § 922(n) should be applied to other individuals but not to him. Nor did he make any arguments based on his individual circumstances. An as-applied challenge "requires courts to examine a statute based on a defendant's individual circumstances." *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024). Therefore, Mr. Walker's as-applied challenge fails at this time. Moreover, "an as-applied challenge to the constitutionality of a statute generally cannot be raised in a pretrial motion to dismiss since it requires an examination of the facts of the case." *Kays*, 624 F. Supp. 3d at 1264 n.1 (citing *United States v. Pope*, 613 F.3d 1255, 1260–61 (10th Cir. 2010)). Therefore, if Mr. Walker's motion to dismiss is denied, he must raise it after conviction at trial.

### B. Section 922(g)(4)

In relevant part, § 922(g)(4) provides: "It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . to . . . possess in or affecting interstate commerce, any firearm." Because the

14

possession of firearms comes within the Second Amendment's plain text, the charged conduct is presumptively protected by the Second Amendment. *See Bruen*, 597 U.S. at 17. Therefore, the Court turns to whether the regulation is consistent with the historical tradition of firearms regulation.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court said that nothing in the opinion should detract from "longstanding prohibitions on the possession of firearms by . . . the mentally ill." *Id.* at 626. "Mentally ill" is not the language used in § 922(g)(4), however. The statute prohibits the possession of a firearm a person "who has been adjudicated as a mental defective" or a person " who has been committed to a mental institution." 18 U.S.C. § 922(g)(4). "Adjudicated as a mental defective" is defined as follows:

> (a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
>
> > (1) Is a danger to himself or to others; or
> >
> > (2) Lacks the mental capacity to contract or manage his own affairs.
>
> (b) The term shall include—
>
> > (1) A finding of insanity by a court in a criminal case; and
> >
> > (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b.

27 C.F.R. § 478.11. The phrase "committed to a mental institution" means "[a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority," including "commitment to a mental institution involuntarily" and

15

"commitment for mental defectiveness or mental illness" or "drug use." 27 C.F.R. § 478.11. What these definitions have in common—and the societal problem Congress meant to address—are "individuals who have been determined to be a danger to themselves or others." *United States v. Gould*, 672 F. Supp. 3d 167, 182 (S.D.W. Va. 2023) ("Thus, the societal problem § 922(g)(4) seeks to address is firearm violence by individuals who have been determined to be a danger to themselves or others—not firearm violence by those who simply have any kind of mental illness.").

The United States argues that § 922(g)(4) is consistent with the historical tradition of keeping firearms out of the hands of people who have been found to be a danger to themselves or others. (Gov't Omnibus Resp. at 11.) In the 18th century, "justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" *United States v. Daniels*, 77 F.4th 337, 349 (5th Cir. 2023) (quotation omitted). "If eighteenth century America viewed it as a permissible infringement on liberty to 'lock up' individuals of unsound mind, then a lesser intrusion on liberty such as a prohibition on firearm possession would seem to have been permissible, as well." *Keyes v. Lynch*, 195 F.Supp.3d 702, 718 (M.D. Pa. 2016). The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents "notes that at the time of the Second Amendment's ratification, citizens were excluded from the right to bear arms if they posed a 'real danger of public injury.'" *Gould*, 672 F. Supp. 3d at 183 (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)).

Historical sources reveal the principle that "dangerous persons could be disarmed." *Id.* at 184. "Accordingly, because there is a historical basis for disarming individuals that

16

have been determined to be dangerous to themselves and/or the public at large, § 922(g)(4) is constitutional on its face." *Id.*

Mr. Walker has not argued that § 922(g)(4) should be applied to other individuals but not to him, nor did he make any arguments based on his individual circumstances. Therefore, Mr. Walker's as-applied challenge to § 922(g)(4) fails at this time. Because an as-applied challenge must be resolved on the facts of a case, however, the Court recommends granting him leave to make the argument at a later time.

### III. Recommendation

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Ricardo Rydell Walker's Motion to Dismiss Indictment (Dkt. No. 21) be **DENIED**; and

2. Defendant Ricardo Rydell Walker's Motion to Suppress Statements, Admissions, and Answers (Dkt. No. 22) be **GRANTED**.

Dated: July 8, 2024                      *s/ John F. Docherty*
                                          JOHN F. DOCHERTY
                                          United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR

72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).